WILLIAM THOMAS, Trustee of the Bank of Illinois, Appellant, *v.* JAMES C. SLOO et al., Appellees.

### APPEAL FROM GALLATIN.

One of several, nor all the assignees in conjunction, appointed to wind up the affairs of the Bank of Illinois, is or are authorized to make a compromise with any debtor of the bank, by which the security of the bank or the trust fund will be diminished, unless some advantage will accrue by such compromise to the creditors of the bank.

THIS appeal brings before the court the record of two causes, which were consolidated, and in the circuit court a decree was entered disposing of both. On the 10th of March, 1847, the defendant Sloo, executed a mortgage to Albert G. Caldwell and Ebenezer Z. Ryan, assignees of the Bank of Illinois, conveying a number of town lots and other lots of land, to secure

the payment of two notes of the same date. In this mortgage the wife of Sloo joined and relinquished her right of dower.

On the 6th of April, 1848, Sloo executed a mortgage to C. Pool upon several tracts of land and town lots, upon which judgment was obtained in June, 1850, and satisfaction thereof obtained by a sale of part of the property, leaving the residue undisposed of and released from the operation of the mortgage and judgment.

On the 13th April, 1848, Sloo executed a mortgage to Catharine Forman upon several tracts of land to secure the payment of a debt previously due.

On the 26th August, 1848, Sloo executed a mortgage to Albert G. Caldwell, upon two lots of land previously mortgaged to said Catharine Forman, to secure the payment of a debt due Caldwell in his own right.

On the 3d of May, 1849, Sloo executed a mortgage to James Hoggins, upon certain personal property, to secure the payment of a debt previously due.

On the same 3d of May, Sloo executed a second mortgage to said Caldwell and Ryan, as assignees, &c., further to secure the payment of the two notes of 10th March, 1847, and to secure several other sums which he had agreed to pay for other debtors to the bank. This mortgage covers the land previously mortgaged to Forman and Caldwell, except one tract mortgaged to Forman; together with a number of other tracts of land and town lots.

On the same day Sloo executed a mortgage to James Hoggins, upon the lands previously mortgaged to Forman and Caldwell, except one lot mortgaged to Forman. He also executed a mortgage to W. & C. Fellows & Co., upon all the lands and lots included in the several mortgages to Forman, Caldwell, Hoggins, and the assignees of the bank, except also one tract mortgaged to Forman. These three last-named mortgages were all acknowledged and filed for record at the same time.

On the 19th of November, a writing was executed by said Caldwell for himself and Ryan, as assignees of the bank, reciting that Sloo was indebted to the said assignees upon the two notes of the 10th of March, 1847, the execution of the mortgage, to secure the payment of said notes, his liability to the assignees upon two other claims, and his agreement to settle the liability of another debtor to the bank, and that " Whereas the said Sloo proposes in compromise and payment and discharge of said liabilities, to sell and convey his interest in the lands conveyed by said mortgage,

and whereas, Judith Sloo, his wife, is willing to join in a con-veyance,— Now be it known that the said A. G. Caldwell and E. Z. Ryan, do, by these presents, agree to receive the said lands in compromise and settlement at the rate and appraise-ment which may be fixed by John Hall and John Crawford; and should they disagree, their decision to be determined by an umpire, to be selected by them; it being understood that the said J. C. Sloo, and Judith, his wife, will execute a deed of release, so as. to vest in the assignees of the bank, being A. G. Caldwell, E. Z. Ryan, George A. Dunlap, and David A. Smith, the fee-simple title for all the lands mentioned in said mortgage. And should the said lands, at the appraisement fixed as afore-said, exceed the amount of indebtedness above mentioned, then such portion of said lands as the appraisers may designate shall be reconveyed to the said Judith Sloo." (Signed) A. G. CALD-WELL, [seal], for himself and E. Z. Ryan, assignees, &c. Upon which agreement, on the first of October, 1851, Ryan indorsed, " I consent to the foregoing arrangement made and entered into by A. G. Caldwell. E. Z. RYAN, assignee, &c."

On the 6th of January, 1850, the said James C. Sloo executed a mortgage to Michael K. Lawlor, upon several of the lots of land conveyed by the second mortgage to the assignees of the bank, to indemnify said Lawlor against loss or damage in con-sequence of his being security for said Sloo on an administration bond.

At the December term, 1850, of the Circuit Court of the United States for the District of Illinois, upon bill in chancery filed by the Bank of the State of Missouri, on the part of that bank and all other creditors of the Bank of Illinois, against the assignees of said last-named bank, a decree was entered, ap-pointing trustees " to take charge of, and to execute the trusts created and existing under and by virtue of the acts of the legis-lature, in relation to the liquidation and finally closing the affairs of the Bank of Illinois, in the place and stead of the assignees." Of the trustees appointed by said court, A. G. Caldwell alone acted, and he having departed this life, at the July term, 1851, of said United States Court, William Thomas was appointed sole trustee of said bank.

On the 29th of October, 1851, the surviving assignees of the bank, by their deed and power of attorney, conveyed to said Thomas as trustee, &c., all of the estate, rights, credits, and effects of the said bank, and vested him with power to use their names when necessary in the collection of debts. ·

On the 31st of October, 1851, Hall and Crawford appraised the lands, which, by the before recited agreement, were to be conveyed to the assignees, at $15,704.15. They estimated

the liabilities of Sloo to the bank at $10,604.15, and designated lands and lots to be reconveyed to the said Judith Sloo, valued at $5,100.

On the 27th of December, 1851, Sloo and wife notified Thomas, the trustee, of the foregoing appraisement, proposed to execute a release so as to vest the fee-simple title to the lands in him, and requested him to reconvey to Judith Sloo the lands designated by the said appraisers, which the said Thomas refused to do.

In June, 1849, Lawlor obtained a judgment on his mortgage; in June, 1850, W. & C. Fellows & Co. recovered a judgment on their mortgage; in September, 1851, James Hoggins obtained a decree upon his mortgage; in July, 1852, Catharine Forman obtained a decree upon her mortgage. Neither the assignees or trustees of the bank had any notice of or were made parties to the proceedings by Fellows & Co., Hoggins, or Forman.

On the 5th of December, 1851, Thomas filed a bill in chancery against Sloo and wife, and numerous judgment creditors, praying a foreclosure of the two mortgages to the assignees, and a sale of the property, to pay the notes secured by the first mortgage, — omitting to make the other mortgagees hereinbefore named, parties.

On the 21st of May, 1852, the said James C. Sloo and wife filed their bill against said Thomas as trustee, to compel him to execute the agreement of compromise made, as alleged, with Caldwell and Ryan: to this bill Thomas answered, admitting that he had refused to execute the agreement of compromise, and insisting that he was not bound to do so, because said agreement was made by Caldwell alone, without the knowledge or coöperation of any of the other assignees, and that Caldwell had no right to make such agreement; because the agreement was made without any consideration, and because the whole of the property referred to in said agreement would not probably sell for one half of the amount due the bank.

At the December term, 1852, of the Gallatin Circuit Court, Thomas filed an amended bill, making the mortgagees hereinbefore named and John E. Hall parties to the suit. The two causes being prepared for hearing upon bills, answers, replications, and exhibits, at the October term, 1853, of the Gallatin Circuit Court, S. S. MARSHALL, Judge, presiding, the cases were consolidated and a *pro forma* decree was entered, from which an appeal was allowed, and is prosecuted to this court by Thomas, the trustee.

Wm. THOMAS, for appellant.

J. A. McClernand and N. L. Freeman, for appellees.

Caton, J. . The important question in these cases is, whether the contract of compromise made between Caldwell and Sloo and wife, is valid and binding, and such a one as a court of chancery will enforce. We think it is not, for several reasons. The law authorized Caldwell and Ryan to compromise the debts due the banks at Shawneetown and Laurenceville, but it did not authorize either one of them to do it alone. It was the design of the law, that those who were interested in the collection of the debts of the bank, should have the benefit of the united judgments of those two assignees, in any compromise of a debt which should be made. Without this no compromise could be valid and binding. It was not enough that one of the assignees should authorize the other to compromise debts and to sign his name to the composition agreement. If such an arrangement were tolerated, the *cestuis que trust* would have the benefit of the judgment and discretion of but one, while they are only bound by compromises made by both. The mere name of the other trustee, signed to the agreement by the one who makes it, cannot help the case. It was not the mere name of Ryan to which the parties interested were entitled, but his judgment and financial skill. This was a power which he could not delegate, either to his coassignee or to any other person.

We have carefully examined the evidence in this case, and are entirely satisfied that Ryan never took part in this agreement of compromise, or exercised his judgment upon it until the first of October, 1851, when he indorsed his approval upon it. The whole negotiation had been conducted by Caldwell under the authority given him by Ryan for that purpose; that he alone made and executed the agreement on behalf of himself and Ryan. Indeed, such is the purport of the agreement upon its face. In that way and in that alone was the agreement made and executed, with the consent and approbation of Ryan. At the time that Ryan did exercise his judgment upon it and actually became a party to it, which was on the first of October, 1851, by the decree of the Circuit Court of the United States and the act of the legislature of the fifteenth of February, 1851, he had been superseded in this trust. As the agreement of compromise was not made in pursuance of the authority vested in the assignees of the bank, the court should not have recognized or enforced it.

But even if it had been well executed, we think its terms are such as a court of equity should not enforce. It is true the

Thomas *v.* Sloo et al.

assignees were authorized to compromise debts due the bank; but in exercising this power they acted not in their own right but as trustees ; and the courts will not enforce the specific performance of an agreement of a trustee against the *cestui que trust*, although the agreement may have been made within the literal scope of the authority vested in the trustee, where it is manifest that the authority has been abused. Here was a large debt secured by mortgage upon a large amount of property. Under the agreement of compromise, the assignees of the bank are to take a part of the property mortgaged, in discharge of the whole debt, and to release the balance, amounting to over five thousand dollars in value, according to the estimate of appraisers. It was the duty of the assignees to collect the debts due the bank, and not to undertake to speculate in real estate. In that view of their duty, it is manifest from the first inspection of the agreement that it could not further the collection of the debt, but might very probably result in the loss of a part of it. At least it amounted to a release of a part of the security without any corresponding benefit or consideration. Before the agreement was made, the assignees were entitled to have the whole property sold, and the proceeds applied in satisfaction of the debt. Under the agreement, if valid, they could only realize the value of a part of it, without any possibility that the part not realized would bring any more than as if the agreement of compromise had not been made. Where, then, was the possible benefit to the trust fund from the compromise, while there is no difficulty in pointing out the probable loss ? We do not hesitate to say that this was not such a compromise as was contemplated by the law, which authorized them to make compromises. The design was to authorize them to recover a part of a debt and to release the whole, where the debt was not secured; but it was certainly intended that there should be a consideration for this entire release by the security, as payment of a greater amount of the debt than was already secured. The very idea of a compromise suggests an advantage to be derived to the creditor, more than he is supposed to have the means of enforcing, in consideration of his extinguishing the whole debt. It is reasonably supposed that a debtor will make an extra effort through his friends or otherwise to pay a greater proportion of a debt than the creditor is sure of collecting, in consideration that the balance of the debt not paid shall be extinguished, so that it cannot embarrass him in the future. The release of the equity of redemption to a part of the land mentioned in the mortgages, did not make them more valuable or more salable than they were before, and the trustees were entitled to have

them sold, and their full value applied upon the debt, as well before as after the compromise.

Where, then, was the justice in, or justification for, the release of five thousand dollars' worth of the security ? It could not be in the release of dower which was to accompany the release of the equity of redemption, for the wife of the mortgagor had joined in the execution of the mortgage, and the title to be derived under a foreclosure of the mortgage was every whit as good as it could be under a voluntary release of the equity of redemption. We do not hesitate to say that this agreement, had it been executed with all formality, is not such an agreement as a court of equity should enforce.

We were asked to enter a final decree in this court; but we think that in cases of this kind, where something has to be done in execution of the decree, as in foreclosure of a mortgage, that the more convenient practice is to remand the suit with instructions to the circuit court to enter a decree in conformity to the views of this court, and see that it is duly executed. Such will be the course pursued in this case. The decree of the circuit court must be reversed and the suit remanded, with directions to the circuit court to enter a decree setting aside the agreement of compromise, and foreclosing the bank mortgages, taking care to preserve the equities of prior incumbrancers where such exist. It is hardly necessary to state, that in reference to the three mortgages which are averred to have been executed and recorded, or filed for record simultaneously, the proceeds of the mortgaged premises should be distributed *pro rata.*

